IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 22, 2005 Session

**STATE OF TENNESSEE V. LARRY ALLEN WHITED
and WILLIAM HENRY RUTHERFORD**

**Appeal from the Criminal Court for Sumner County
No. 186-2003     Jane Wheatcraft, Judge**

**No. M2005-00167-CCA-R3-CD - Filed March 7, 2006**

The Defendants were convicted of second degree murder and reckless endangerment.  Defendant
Whited was also convicted of three counts of aggravated assault.  On appeal, both Defendants argue
that the trial court erred by allowing the State to introduce evidence of certain activity they engaged
in after the crimes were committed, and that the evidence is insufficient to support their convictions.
Defendant Whited argues that the trial court erred by denying his motion to suppress the statement
he gave to the police.  Both Defendants also challenge the trial court's sentencing determination.
After review, we affirm the trial court's judgments in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined.
DAVID G. HAYES, J., filed a dissenting opinion.

Walter H. Stubbs, Gallatin, Tennessee, for the appellant, Larry Alan Whited.
Charles R. Bobbitt, Jr., Hendersonville, Tennessee, for the appellant, William Henry Rutherford.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General;
Lawrence Ray Whitley, District Attorney General; and Sallie Brown, Assistant District Attorney
General, for the appellee, State of Tennessee.

**OPINION**

FACTS

On March 6, 2003, the Sumner County Grand Jury indicted Defendants Larry Whited and
William Rutherford for premeditated and felony first degree murder and attempted first degree
murder.  Defendant Whited was also indicted for three counts of aggravated assault.  Following a
trial in April 2004, a jury convicted Whited of second degree murder, reckless endangerment, and
three counts of aggravated assault.  The same jury convicted Defendant Rutherford of second degree

murder and reckless endangerment. The trial court sentenced Whited to twenty-five years for second degree murder, two years for reckless endangerment, and six years for each aggravated assault conviction, all of which were ordered to be served consecutively. Rutherford received consecutive sentences of twenty-five years for second degree murder and two years for reckless endangerment. Both Defendants filed motions for new trials, which were denied, and both have now appealed to this Court.

The crimes in this case occurred in Gallatin on the evening of January 12, 2003. Whited confronted Rhonda Demoss at her residence about statements she allegedly made to his wife suggesting he was having an extramarital affair. Rutherford accompanied Whited to the Demoss residence. Several other people were present at Rhonda Demoss' home when the Defendants arrived: Wayne Demoss, Rhonda Demoss' husband; Charlie Demoss, Wayne Demoss' brother; Brandon Williams, a family friend; April Murdock, Wayne Demoss' cousin who lived with Rhonda and Wayne; Heather Engeman, a family friend; and Triston Bolton and Tyler, two young children who Rhonda Demoss babysat. Both Defendants were armed with weapons when they arrived at the Demoss residence. Altercations ensued during which Mr. Williams and Charlie Demoss were shot. Mr. Williams, who was twenty years old, died as a result of his wounds; Charlie Demoss was not fatally wounded and was able to flee from the home and seek help. The Defendants fled the premises, but they were arrested the following day.

The following is a summary of the trial testimony. Rhonda Demoss and her family were friends with both of the Defendants. When the Defendants knocked on Ms. Demoss' front door, Charlie Demoss opened the door and allowed them inside. The Defendants appeared to be angry. Once inside, Whited approached Wayne Demoss, who was sitting in a reclining chair, pointed his SKS assault rifle at him, and demanded money. Because they knew each other, Wayne Demoss thought Whited was just joking around, so he stood up and pushed the rifle away. However, Whited said he was not playing, and he aimed his rifle back at Wayne Demoss' face. Wayne Demoss thought: "I was fixing to die." Whited then directed Rutherford, who was holding a 9-millimeter Ruger semiautomatic handgun, to shoot Wayne Demoss. At this point, Charlie Demoss attempted to intervene, and he initially succeeded in getting the gun from Rutherford. During the ensuing struggle, Rutherford pulled the gun away from Charlie Demoss' hand and shot him in the side. Charlie Demoss ran upstairs; Wayne Demoss went into the kitchen to quiet the dogs but then "slipped out the back door to try to get help."

Ms. Demoss was upstairs checking on Triston when she saw Charlie Demoss. After learning he had been shot, Ms. Demoss told her brother-in-law he had to leave, so they pushed out the window screen. He then jumped from the second-story bedroom window and ran to get help. Meanwhile, Ms. Demoss grabbed Triston and was on her way to Ms. Murdock's bedroom to hide him in the closet where Ms. Murdock had hidden Tyler when Whited came up the stairs. Whited pointed his rifle at Ms. Demoss and yelled at her to put the baby down. Triston was still crying after hearing the gunshot that struck Charlie Demoss.

While standing at the top of the steps with his rifle pointed at her face, Whited questioned Ms. Demoss about why she told his wife earlier that day that he was cheating on her. Whited told Ms. Demoss that she owed him $2,000 because his wife destroyed some of his belongings after hearing about his alleged affair. According to Ms. Demoss, Whited had a "look in his eyes. . . . Like he was fixing to blow my head off or evil. Not a look I had ever seen on his face before." Whited was yelling at Ms. Demoss the entire time, and she thought to herself, "He was fixing to blow my brains out." Ms. Murdock and Ms. Engeman were standing near Ms. Demoss. Ms. Murdock begged Whited not to hurt anyone. Whited pointed his rifle at her as well and yelled for her to keep quiet. Ms. Demoss noticed Mr. Williams "creeping up" the stairs behind Whited. Whited turned around, pointed the rifle at Mr. Williams, and yelled at Rutherford to "come get this bitch." Mr. Williams started backing down the stairs. Ms. Demoss and Ms. Murdock then observed Rutherford approach Mr. Williams, point his handgun at his head, and lead him around the corner and out of view.

After Rutherford led Mr. Williams down the stairs, Ms. Demoss heard three gunshots within what "seemed like a matter of seconds." Ms. Murdock also heard the gunshots "right after" Rutherford led Mr. Williams down the stairs and out of their sight. After hearing the gunshots, Whited looked Ms. Demoss in the eyes, then turned and ran down the stairs. "And then just a couple of seconds after he got down there, [Ms. Demoss] heard a different boom. And then [she] heard one of them say, 'Let's bounce.'" When she went downstairs after the Defendants left the home, Ms. Demoss saw Mr. Williams lying on the kitchen floor. He looked at her and begged her not to let him die. Lying on the floor next to Mr. Williams was a knife, which Ms. Demoss placed on the counter top. Ms. Engeman and Ms. Murdock stayed in the kitchen with Mr. Williams while Ms. Demoss ran next door for help. Mr. Williams said to Ms. Murdock, "L.C. and Will. L.C. and Will. William Rutherford did this." L.C. is Whited's nickname.

When Wayne Demoss left his house, he went to the home of their neighbor, Danny Burnette. He told Mr. Burnette "they were shooting" and asked Mr. Burnette to get him out of the neighborhood. Mr. Burnette saw the Defendants exit the Demoss residence. Both men were carrying weapons. Mr. Burnette asked them what happened; Whited said: "He killed the motherfucker." The Defendants got into their car, and Mr. Burnette followed them. He noticed Rutherford throw a pistol out the window.

The police found one bullet in the living room where Charlie Demoss was shot and three in the kitchen where Mr. Williams was shot. One bullet was recovered from Mr. Williams' body. All of the bullets and shell casings were fired from the 9-millimeter Ruger. No shell casings were found in the kitchen, and no blood stains were found in the living room. Gunshot residue was found on the shirt Rutherford was wearing at the time of his arrest. Mr. Williams suffered four gunshot wounds, two of which entered through his back. According to the medical examiner: "This pattern of bullets, where the victim is shot in front, in the back; also shot on one side or the other, tells me that this person was moving. It was a very dynamic scene, meaning there was movement going on. This person was turning and moving as they were being shot."

The Defendants were arrested in a Nashville hotel room the following afternoon, January 13, 2003. Two women were present in the Defendants' hotel room. Inside the hotel room, the police found one ammunition round matching the assault rifle, a pipe used for smoking crack cocaine, and a plastic bag containing eleven Xanax pills. When first interviewed by the police, both Defendants denied any involvement in the crimes. They stated they were in Nashville in the hotel room with the same two females watching television, taking drugs and having sex. When asked to explain why eyewitnesses placed both of them at the Demoss residence on the evening of January 12, 2003, the Defendants said the witnesses were lying. Upon further questioning by the police, both Defendants eventually gave confessions. Rutherford told the police they were going to the Demoss residence "to shoot up the house but we thought that wasn't smart seeing how there might be some kids in there." Rutherford stated that he shot Mr. Williams because Mr. Williams was advancing toward him with a knife in his hand.

> I was like ah, Tank [Mr. Williams' nickname] man chill Cuz it don't concern you like this man just chill. He kept saying I'm gonna die today, I'm gonna die today one of y'all is gonna kill me, that's all he kept saying and he came back downstairs and so I'm watching you know what I'm saying so he went in there and picked up a big ass kitchen knife man I was scared for my life, no lie, I was scared for my life so I shot him. . . . It was like a movie you wouldn't even believe. I shot him one time in his arm and he like looked at it man like it wasn't nothing. He said is that all and I did it again. . . . Yea and I was telling him man, please Cuz stop don't come in here with that knife he just kept coming man.

Whited initially stated that they went to the Demoss residence with the intent to kill Ms. Demoss. However, he stated they changed their mind and decided just to scare Ms. Demoss because children would be present. "I mean we just went in with the sole purpose just to put some fear in their heart." He admitted pointing his weapon at Wayne Demoss and Ms. Demoss while she was holding Triston. Whited stated that he acquired both of the weapons in advance and asked Rutherford to join him in going to the Demoss residence. Whited admitted he was upset with Ms. Demoss for telling his wife about his alleged affair and said his anger was the motivation for his visit to her home that night. Both Defendants said they cried over the loss of their friend.

A sentencing hearing was conducted on June 24, 2004. At the time of the offenses in this case, Rutherford was nineteen years old and Whited was twenty-one years old. Rutherford has an extensive record of juvenile court proceedings in Sumner County. He was in and out of foster care during his youth. At the time of his arrest, Rutherford was on probation for an assault conviction. According to the presentence report, Rutherford was raised by his aunt. He did not know his mother and did not have a personal relationship with his father. Rutherford dropped out of school after the eleventh grade and has a sporadic work history.

Whited also has an extensive juvenile record and was in and out of state custody and foster care during his adolescence. At the time of his arrest, Whited was on probation for a conviction for attempt to possess under .5 grams of cocaine for resale. Whited also has a prior conviction for

assault.  Whited dropped out of high school, but he has completed his GED.  Whited was married at the time of the offenses, and he has a son.  He was unemployed and has a sporadic work history.

During the sentencing hearing, several of the victim's family members testified about the loss of Mr. Williams.  They asked the court to impose the maximum sentences for the crimes committed. Whited's mother, Tammy Whited, testified on his behalf.  Whited has two younger brothers.  His father was abusive, and his mother moved with her three children to Tennessee when Whited was about six years old.  Ms. Whited acknowledged that her son was in and out of state custody from age ten or eleven until adulthood.  It is evident from her testimony that Ms. Whited was not particularly involved in her son's childhood:  "Well, basically, I mean, I had three kids.  It wasn't a whole lot. He was probably eleven and taking care of his brothers because I couldn't afford to put a roof over their head and feed them and be there all at the same time.  He has had it kind of rough."  Rutherford did not call any witnesses at sentencing to testify on his behalf.

Following the imposition of the sentences, the Defendants filed motions for new trials.  The trial court held a hearing on the motions, and after listening to the arguments of counsel, the court denied the Defendants' motions.  This appeal followed.

ANALYSIS

On appeal, both Defendants raise issues concerning errors committed at trial and during sentencing.  They claim the trial court erred in allowing the State to introduce evidence about their activity after the crimes.  They also contend the evidence was insufficient to support their convictions.  In addition, Whited argues that the trial court erred in denying his motion to suppress his statement to the police.  Both Defendants also claim the trial court did not follow the applicable sentencing guidelines before imposing the sentences.

I.      Suppression of Whited's Statement
Whited contends that the trial court erred in denying his pretrial motion to suppress his incriminating statement to the police.  Whited argues that, despite his request for an attorney, the officer continued questioning him about his involvement in the crimes.  After listening to the testimony of the interrogating officer and the arguments of counsel, the trial court denied the motion to suppress.

Before the officer started questioning Whited about the crimes in this case, Whited was advised of his rights, including his right to counsel.  Whited was given a printed form to read, which explained his rights, and, in addition, the questioning officer read Whited his rights aloud.  Whited was informed that if he decided to answer any questions without a lawyer present, he would maintain the right to stop the interview at any time and speak with an attorney.  Whited signed a statement waiving his rights, and the officer commenced the interview.

Whited initially denied any knowledge or involvement in the crimes; he stated he was in Nashville on the night in question.  However, as the interview progressed, Whited started to

equivocate on his earlier denial. The officer, having the benefit of eyewitness accounts placing the Defendants at the scene of the crimes, told Whited what the police already knew. Whited, at one point during the interview, told the officer that he viewed his options as twofold: keep denying any involvement, or tell the police that he and Rutherford went to the Demoss residence but that "something happened wrong from how we planned it and somebody got shot and I didn't see it." The officer then tried to convince Whited that it would be in his best interest to accept responsibility. At this point during the interview, which is the exchange at issue on appeal, the following occurred:

> Whited: Well ok I have like 3 questions, #1 I don't think is gonna be possible but I'm gonna ask it anyway #1 before I say anything else on this tape or that I tell you that I f--king can jump over the Goddamn moon you know ah, could I speak to William?
>
> Officer: Uh ha [affirmative]
>
> Whited: Ok, if I can speak to William and I can talk to him for a second *and another thing is I was gonna say can we stop this interview right now and let me talk to a lawyer in the morning and then we have another interview and, that's not possible? Ok*, and ah, shit I was fixing to ask you another question. Ok, say I'm, I'm just making a scenario here, say you kill somebody but you did it on accident and
>
> Officer: Involuntary manslaughter.
>
> Whited: Ok, and how much time is that?

[Emphasis added].

The officer then attempted to explain how much time Whited would serve if actually convicted of manslaughter. Immediately thereafter, Whited asked, again, if he could speak to Rutherford: "Ok, cause I mean . . . I just, I'd rather, I'd rather talk to him before I say anything else." The officer told Whited he would allow him to speak with Rutherford, and the officer stopped the interview. However, after conferring with fellow officers, the interrogating officer returned to the interview room, informed Whited that he would not be allowed to talk to Rutherford, and continued the interview. Whited eventually admitted his involvement in the crimes.

Whited contends that he unequivocally requested an attorney when he asked, "can we stop this interview right now and let me talk to a lawyer in the morning and then we have another interview." The State argues that this was not an unequivocal request for counsel. The State contends that Whited was simply posing a hypothetical question to the officer. In his testimony during the pretrial hearing, the interviewing officer stated that he "may have shook [his] head no" when Whited asked if they could continue the interview if he spoke with an attorney in the morning. In denying the motion to suppress, the trial court stated:

This is a pretty close question, I think. One of the things that does influence me is that he had earlier signed a waiver, an admonition and waiver, and it stated – in there it states, 'You also have the right to stop answering at any time until you talk to a lawyer.' The fact that he had been read that and signed it, and given his past experience, which I'm not sure I can really rely on, but given the fact that he did have his rights read to him and waived them, that might be enough to not suppress that statement because he did go on talking after that.

The findings of fact made by the trial court at a hearing on a motion to suppress are conclusive on appeal and binding upon this Court unless the evidence preponderates otherwise. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this Court is not bound by the trial court's conclusions of law, State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002), as the application of the law to the facts found by the trial court are questions of law that this Court reviews de novo on appeal. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Yeargan, 958 S.W.2d at 628. The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing, as well as all reasonable and legitimate inferences that can be drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). Finally, both the evidence presented at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides, in relevant part, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Likewise, the Tennessee Constitution guarantees that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. An accused may waive these rights, however, the waiver must be voluntary, knowing, and intelligent. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Moreover, "the accused must be adequately and effectively apprized of his rights and the exercise of those rights must be fully honored." Id. at 467.

In Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the United States Supreme Court held that police officers must immediately cease questioning a suspect once the suspect clearly asserts his or her right to have counsel present during custodial interrogation. The suspect's request for an attorney during any further questioning must be articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994). Our supreme court has held that "[t]he standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 [of the Tennessee Constitution] and the Fifth Amendment [to the United States Constitution]." State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003). Accordingly, if the accused's statement fails to meet the requisite level of clarity, the officers are not required to stop the interrogation to clarify any equivocal request for counsel. Id. Whether a suspect makes an equivocal or an unequivocal request for an attorney is a question of fact. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996). And,

as set forth above, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Odom, 928 S.W.2d at 23.

Having reviewed the entire record on appeal, we conclude that the trial court did not err in denying Whited's motion to suppress. The evidence does not preponderate against the trial court's findings. When read in context of the ongoing interview, Whited's question to the officer was not an equivocal request for an attorney. Whited's primary concern was being able to talk to his co-defendant. After he was initially granted permission to speak to Rutherford, Whited then asked the officer whether the interview could continue if Whited met with an attorney. The officer, apparently by shaking his head in the negative, informed Whited that the interview would terminate. Contrary to the Defendant's assertion, we do not believe the evidence shows that the officer, by shaking his head, informed Whited that he could not confer with an attorney. Whited did not clearly request an attorney; he asked whether or not he would be allowed to continue talking with the officer. Whited, who was already aware of his right to stop the interview at any time and meet with an attorney, decided to continue talking with the officer. Whited did not make any further mention of an attorney, even after he was ultimately denied permission to meet with Rutherford. Given these circumstances, we do not believe a reasonable police officer would have understood Whited's question to be an unequivocal request for an attorney. This issue is without merit.

II.     Evidence of Other Bad Acts

When first questioned by the police, the Defendants denied any involvement in the crimes stating, instead, that they were with two women in a hotel room in Nashville having sex and taking drugs. The Defendants ultimately confessed to being present at the scene of the crimes, however, they were arrested in a hotel room in the presence of women and drugs. Prior to trial, the Defendants filed motions in limine to exclude the admission of any evidence regarding the women or drugs. The State argued that the statements made by the Defendants were relevant because the Defendants initially denied any involvement in the crimes. The State further argued that the evidence was relevant to help establish premeditation and show lack of remorse. The trial court allowed the police detective to testify about the Defendants' initial statements in which they denied being involved because they were in a hotel room having sex and using drugs. The court also allowed into evidence the fact that the Defendants were arrested the following day in the hotel room in the presence of the two women and the drugs. The trial court, however, did not allow the officer to mention any vulgar language used by the Defendants to describe their sexual activity or drug use.

The Defendants argue that any probative value of this evidence was outweighed by the danger of unfair prejudice. The Defendants argue the State's sole purpose for introducing this evidence was to establish their bad character. The State contends the trial court ruled appropriately. In the alternative, the State argues any error by the trial court in this respect was harmless.

Rule 404(b) of the Tennessee Rules of Evidence provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Prior to the admission of such evidence, the trial court must hold a jury-out hearing upon request, determine if

there is a material issue other than conduct conforming to a character trait, and upon request state on the record the material issue, the ruling and the reasons for admitting the evidence. Id. The court must find by clear and convincing evidence that the defendant committed the acts at issue and must then conclude that the probative value outweighs the danger of unfair prejudice. Id.

It is generally recognized that evidence of other acts may be admitted under Rule 404(b) in order to prove intent. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). The Defendants were both charged with first degree murder, and the State argued that evidence about their activities immediately after the crimes was probative of premeditation. See, e.g., State v. Millsaps, 30 S.W.3d 364, 369 (Tenn. Crim. App. 2000) (calmness immediately after a crime is relevant in determining premeditation). Although the trial court permitted the State to introduce this evidence in its effort to prove premeditation, the court was concerned about the prejudicial effect of the particular language used by the Defendants. The court redacted much of the Defendants' statements and allowed the State to introduce only enough evidence to show the jury the Defendants' initial alibi claims and the location of the Defendants at the time of their arrest. Although the Defendants stated, while fabricating their alibis, that they engaged in sexual activity and drug use in the hotel, nowhere in their latter statements in which they admitted going to the Demoss residence did they say they went back to the hotel to have sex or use drugs. Instead, the jury heard evidence that both Defendants went back to the hotel and "cried for hours." Having reviewed the entire record, including transcript of the parties' pretrial arguments and the trial court's ruling, we cannot conclude that the trial court erred by admitting the evidence.

Nevertheless, even assuming for the sake of argument the trial court erred in allowing this evidence, the Defendants have failed to demonstrate how they were unfairly prejudiced by its admission. The Defendants were actually convicted of lesser included offenses on the indicted charges. Accordingly, the State was unsuccessful in its effort to establish premeditation based upon the post-crime activities of the Defendants. Furthermore, as discussed below, there was ample evidence otherwise to support the jury's verdict. Thus, any error regarding the admission of this evidence was harmless. See Tenn. R. Crim. P. 52(a) ("No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits.").

III.    Sufficiency of the Evidence

Both Defendants challenge the sufficiency of the evidence to support their convictions for second degree murder. They argue that Rutherford killed Mr. Williams during a state of passion produced by adequate provocation. Thus, they argue, the evidence warrants convictions of voluntary manslaughter instead of second degree murder. Whited also challenges the jury's verdict as to the aggravated assault charge against Triston Bolton. Whited argues that, because of the victim's age, the victim could not have been "cognizant of the threat of physical harm posed by the display of a firearm."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support

the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

A. Second Degree Murder

Second degree murder is defined by statute as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly in the context of second degree murder when he or she is "aware that [his or her] conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). The lesser charge of voluntary manslaughter also includes the "knowing killing of another," but adds the additional element that the killing was done "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

Whited was found guilty of second degree murder based upon his criminal responsibility for Rutherford's conduct. Our statutes provide that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to the benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Id., Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Under a theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which the defendant's participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible

-10-

for the crime. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "'associate himself with the venture, act with knowledge that the offense is to be committed, and share in the criminal intent of the principle in the first degree.'" Id. (quoting State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

Relying upon Rutherford's own version of the events, the Defendants both argue that Rutherford shot Mr. Williams in order to prevent him from attacking Rutherford with a knife. The Defendants allege that Rutherford "attempted to avoid mortally wounding the victim and shot him in what Rutherford thought was his arm." However, according to the Defendants' theory, Mr. Williams "kept coming towards Rutherford with the knife and Rutherford fired the gun three times in rapid succession to stop [Mr.] Williams' advance."

Examining the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to sustain the Defendants' convictions for second degree murder. The jury heard testimony that Mr. Williams was shot within a matter of seconds after having been led, at gunpoint, downstairs and out of view. Furthermore, the medical evidence revealed that Mr. Williams was shot twice in his back. This evidence tends to refute the Defendants' version that Mr. Williams, after being led down the stairs at gunpoint, went into the kitchen, retrieved a knife, and was then shot while advancing toward Rutherford. Again, the jury was not obligated to accept Rutherford's version of the facts. The jury was expressly charged with instructions on voluntary manslaughter, reckless homicide and criminally negligent homicide, but they rejected those and convicted the Defendants of second degree murder. As stated above, this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.2d at 236. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See Bland, 958 S.W.2d at 659.

Furthermore, the evidence was sufficient for the jury to find that Whited was criminally responsible for the conduct of Rutherford. Whited was the leader of the criminal enterprise in this case. Whited furnished Rutherford with the pistol, solicited Rutherford to accompany him to the Demoss residence, and directed Rutherford to lead Mr. Williams back down the stairs after Mr. Williams attempted to intervene in Whited's confrontation with Ms. Demoss. The Defendants have failed to carry their burden of demonstrating that no rational trier of fact could have reached the conclusion of guilt of second degree murder beyond a reasonable doubt.

B. Aggravated Assault

Aggravated assault, as charged in this case, is committed when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). A person acts knowingly when, with respect to a result of the person's conduct, "the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person's action may be knowing, irrespective of that person's desire that the conduct or result will occur. Id., Sentencing Commission Comments.

Whited argues that he did not intentionally place Triston in fear of bodily injury. He also argues that Triston, because he was only seventeen months old, could not appreciate the fear of any imminent bodily injury as a result of the weapon being pointed in his direction. Whited contends "it would be implausible for a child that age" to understand the potential harm posed by an assault rifle. Ms. Demoss held the child in her arms while Whited pointed the rifle at her. Whited alleges that he specifically directed Ms. Demoss to put Triston down. Although Whited may not have acted intentionally toward Triston, the evidence clearly shows that his actions were knowing, as defined above.

In support of his argument, Whited comments on the fact that Triston did not testify at trial. Whited's argument, however, ignores the long-standing rule that criminal offenses may be established exclusively by circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 393 (Tenn Crim. App. 1999). Indeed, this Court has previously held that a victim's fear may be inferred from the circumstances surrounding the offense, even though the victim did not testify about being afraid. See State v. Jamie John Schrantz, No. W2002-01507-CCA-R3-CD, 2003 WL 22888910 (Tenn. Crim. App., Jackson, Dec. 2, 2003) (though victim denied being placed in fear, court found victim's fear of imminent bodily injury could be inferred from circumstances, including witness descriptions that victim was crying and acting scared); State v. James Albert Adams, No. M1998-00468-CCA-R3-CD, 1999 WL 1179580 (Tenn. Crim. App., Nashville, Dec. 15, 1999) (though defendant's actions were directed toward another and victim did not testify she was afraid, fear inferred from circumstances in which defendant wielded deadly weapon toward another in victim's immediate presence); State v. Harry Jamieson, No. W2003-02666-CCA-R3-CD, 2004 WL 2996910 (Tenn. Crim. App., Jackson, Dec. 23, 2004) (though victims did not testify at trial, court concluded evidence sufficient for jury to infer victims were in fear based on testimony of other witnesses); State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 WL 32755555 (Tenn. Crim. App., Jackson, Jan. 25, 2002) (victim did not testify at trial but fear inferred from circumstances of the offense). Accordingly, the fact that Triston did not testify or offer any statements about being placed in fear does not discount the jury's verdict.

Moreover, we agree with the State's assertion that Whited's argument, that "it is unlikely a 17-month old baby even has the capacity to fear imminent bodily injury from the use or display of a deadly weapon," is without merit. The evidence in this case sufficiently showed that Whited's actions placed Triston in fear of imminent bodily injury. In State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at * 2 (Tenn. Crim. App., Jackson, May 8, 1998), this Court observed that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." The Court further recognized that "the apprehension of imminent bodily harm may be inferred from the conduct of the victim following the assault." Id.

According to the testimony in this case, the scene at the top of the stairs was very intense. In addition to screaming and cursing at her for betraying him, Whited was yelling at Ms. Demoss to put Triston down. Ms. Murdock was yelling at Whited not to hurt the child. Triston was crying and grabbing Ms. Demoss. Ms. Demoss tried to pull Triston away from her, but he would not let go.

All the while he was screaming and cursing, Whited was pointing his rifle at Ms. Demoss. All the while Ms. Demoss was standing there at the barrel-end of the rifle, she was holding Triston in her arms. Moreover, Ms. Demoss testified that Triston first started crying after he heard the gunshot that struck Charlie Demoss in the side. Ms. Demoss was holding Triston in her arms when Charlie Demoss ran upstairs to her bedroom, said he had been shot, and lifted up his shirt to show Ms. Demoss the wound. Under all of these circumstances, a rational jury could easily infer that Triston was in reasonable fear of imminent bodily injury, and also that Whited knew his actions were reasonably certain to cause this result. This issue is without merit.

IV.    Sentencing

Both Defendants make several arguments regarding the propriety of the sentences imposed. They argue that the trial court erroneously applied enhancement factors that were elements of the charged offenses, failed to consider appropriate mitigating evidence, and erred in considering facts not previously adjudicated by the jury. They also argue that the trial court erred in imposing consecutive sentences.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).[1] To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have

---

[1] We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendants' crimes in this case, as well as their sentencing, predate the effective date of these amendments. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes was committed.

preferred a different result.  See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).
We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes
and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported
by the record.  See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).  The burden of showing that
a sentence is improper is upon the appealing party.  See Tenn. Code Ann. § 40-35-401 Sentencing
Commission Comments; Arnett, 49 S.W.3d at 257.

A.      Length of Sentences
The trial court must begin its sentencing consideration with a presumption at the midrange
for Class A felonies and at the minimum of the sentencing range for Class B, C, D and E felonies.
From this presumptive sentence, the court may then enhance the sentence within the range as
appropriate, based upon applicable statutory enhancement factors, and may then reduce the sentence
as appropriate for any mitigating factors.  Tenn. Code Ann. § 40-35-210(c) and (e).  The weight to
be given any individual enhancement or mitigating factor is within the sound discretion of the trial
court.  State v. Souder, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002).

In this case, both Defendants were Range I, standard offenders.  They were facing sentences
of fifteen to twenty-five years for second degree murder, a Class A felony, and one to two years for
reckless endangerment, a Class E felony.  Whited was also facing three to six years for each
aggravated assault conviction, Class C felonies.  For Rutherford, the trial court applied seven[2]
enhancement factors for the second degree murder conviction and five[3] of the same enhancement

---

[2] (2)  The defendant has a previous history of criminal convictions or criminal behavior in addition to
those necessary to establish the appropriate range;

(9)  The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving
release in the community;

(10)  The defendant possessed or employed a firearm, explosive device or other deadly weapon during the
commission of the offense;

(11)  The defendant had no hesitation about committing a crime when the risk to human life was high;

(14)  The felony was committed while on . . . probation;

(17)  The crime was committed under circumstances under which the potential for bodily injury to a victim was
great; and

(21)  The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would
constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114.

[3] The trial court did not apply factors (10) and (11) toward this conviction.

factors for the reckless endangerment conviction.[4]  For Whited, the court applied nine[5] enhancement factors for the second degree murder and reckless endangerment convictions and eight[6] enhancement factors for the aggravated assault convictions.[7]  The trial court did not find any applicable mitigating factors.  The trial court imposed upon the Defendants the maximum sentences for each conviction.

Both Defendants argue that the trial court erroneously applied enhancement factors (10) and (17) toward the sentences for second degree murder and reckless endangerment.  Whited also challenges the application of these same factors, in addition to factor number (4), toward his aggravated assault sentences.  On appeal, the State concedes the trial court misapplied enhancement factor (17), that the crime was committed under circumstances under which the potential for bodily injury to the victim was great, to both of the Defendants' sentences for second degree murder and reckless endangerment, as well as to Whited's convictions for aggravated assault.  See State v. James Johnson, No. W2003-02009-CCA-R3-CD, 2004 WL 2378256, at *13 (Tenn. Crim. App., Jackson, Oct. 20, 2004) (this enhancement factor inherent in offense of second murder); State v. Kerry D. Hewson, No. M2004-02117-CCA-R3-CD, 2005 WL 2438386, at *6 (Tenn. Crim. App., Nashville, Sep. 28, 2005) (this enhancement factor inherent in offense of reckless endangerment); State v. Hill, 885 S.W.2d 357, 363-64 (Tenn. Crim. App. 1994) (this enhancement factor inherent in the offense of aggravated assault).

---

[4]  In its brief, the State assumes that the trial court applied the same seven enhancement factors for both convictions.  However, Rutherford argues that it is unclear which factors were applied to which conviction.  Having reviewed the transcript of the trial court's findings, we conclude that the trial court applied seven factors toward the second degree murder sentence and five toward the reckless endangerment sentence.

[5]  (2)  The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
   (3)  The defendant was a leader n the commission of an offense involving two (2) or more criminal actors;
   (4)  The offense involved more than one (1) victim;
   (9)  The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
   (10)  The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
   (11)  The defendant had no hesitation about committing a crime when the risk to human life was high;
   (14)  The felony was committed while on . . . probation;
   (17)  The crime was committed under circumstances under which the potential for bodily injury to a victim was great; and
   (21)  The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114.

[6]  The trial court applied all of the same enhancement factors, except number (4), for these offenses.

[7]  Similar to Rutherford, Whited argues in his appellate brief that it is unclear which factors the trial court applied to which convictions.  Having again reviewed the transcript, we conclude that the trial court applied the same nine enhancement factors toward the second degree murder and reckless endangerment sentences and applied eight enhancement factors toward each aggravated assault sentence.

In addition, the State concedes the trial court misapplied enhancement factor (4), that the offense involved more than one victim, toward Whited's sentences for second degree murder and reckless endangerment.[8] See State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (this factor cannot be applied when defendant is convicted of separate offenses against each victim). The State also concedes the trial court erroneously applied enhancement factor (10), that the Defendants possessed or employed a firearm during the commission of the offense, to both of the Defendants' sentences for reckless endangerment and to Whited's sentences for aggravated assault. Because the use of a deadly weapon is an essential element of each of these offenses as found by the jury, the trial court was not allowed to enhance the sentences based upon this factor. Tenn. Code Ann. § 40-35-114. We agree with the State regarding these trial court errors.

However, the State asserts the trial court properly applied enhancement factor (10) to the Defendants' sentences for second degree murder. The State contends this factor, that the Defendants possessed or employed a firearm during the commission of the offense, is not an element of the crime of second degree murder. See State v. Hampton, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000) ("The use of a gun is neither an element of second degree murder nor inherent in the offense."). We agree. Furthermore, having conducted our de novo review of the record, we conclude the remaining enhancement factors applied by the trial court are appropriate.

Accordingly, the trial court properly applied six enhancement factors, numbers (2), (9), (10), (11), (14) and (21), toward Rutherford's sentence for second degree murder, and five enhancement factors, numbers (2), (9), (11), (14) and (21), toward his sentence for reckless endangerment. The trial court appropriately applied seven enhancement factors, numbers (2), (3), (9), (10), (11), (14) and (21), to Whited's sentence for second degree murder, and six enhancement factors, numbers (2), (3), (9), (11), (14) and (21), to his sentences for reckless endangerment and aggravated assault.

The trial court did not specifically comment on any mitigating factors. Both Defendants argue the trial court erred when it failed to consider mitigation or state on the record that it was not giving any weight to any mitigating factors. Rutherford argues that one mitigating factor is applicable toward his sentences, mainly, that the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. Tenn. Code Ann. § 40-35-113(11). Whited argues that four mitigating factors are applicable to his sentences: (9) the Defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses; (10) the Defendant assisted the authorities in locating or recovering any property or person involved in the crime; (11) the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to

---

[8] In its brief, the State concedes that enhancement factor (4) should not have been applied to Whited's sentences for aggravated assault. However, the trial court did not apply this factor to those sentences. Instead, the trial court applied factor (4) to Whited's sentences for second degree murder and reckless endangerment. We assume the State mistakenly referred to the aggravated assault convictions. Based upon every other reference in its brief on this issue, the State recognizes that factor (4) was applied to Whited's second degree murder and reckless endangerment convictions.

violate the law motivated the criminal conduct; and (13) any other factor consistent with the purposes of this chapter, mainly, that the Defendant showed remorse for his actions. § 40-35-113 (9), (10), (11) and (13).

Although the trial court apparently did not find any mitigating factors, we recognize that no particular weight need be given a particular enhancement or mitigating factor. Hampton, 24 S.W.3d at 832. Having again conducted our required de novo review of the entire appellate record in this case, we cannot conclude that the trial court erred by not finding the presence of the mitigating factors argued by the Defendants, or, if the factors were present, that the trial judge abused her discretion by giving the factors insufficient weight. Given the criminal background of both Defendants, mitigating factor (11) warrants little weight, if any at all. Although Whited claims to have assisted the police in recovering the weapons used in the commission of the crimes, the investigating officer testified at trial that the recovery of the guns "was more good work by the police department than [Whited's] help." Factor number (10), therefore, is not given much weight. Whited argues that his confession assisted the authorities in obtaining Rutherford's confession. However, as the State observes, the police already had Rutherford in custody, and they possessed other direct evidence of Rutherford's involvement in the crimes. Accordingly, we do not assign any weight to mitigating factor (9). Finally, Whited states that his showing of remorse should be considered in mitigation. Whited argues that the victim was his "good friend and [he] regretted that the events had taken place." Even though Whited and Rutherford both stated they cried that night after committing the crimes, neither one attempted to assist Mr. Williams after he had been shot. Instead, the Defendants immediately fled the scene, stealing a video game on their way out of the house. Furthermore, both Defendants initially denied any involvement in the crimes. We therefore give little weight to the Defendant's remorse.

Based upon the foregoing analysis, and keeping in mind the purposes and principles of the 1989 Sentencing Act, we conclude that the sentences imposed by the trial court are appropriate under the facts and circumstances of this case. Although the trial court misapplied several enhancement factors, we find that the remaining enhancement factors, weighed against the lack of any substantial mitigation, justifies the punishment handed down by the trial court. Accordingly, the Defendants' challenges to the lengths of their sentences are denied.

### B. Consecutive Sentencing

Both Defendants argue that the trial court erred in imposing consecutive sentences. They claim the length of the punishments do not reasonably relate to the severity of the offenses committed. However, our review of the record on appeal leads us to conclude that the trial court made the requisite factual findings necessary to support consecutive sentencing and that the aggregate length of the sentences imposed was indeed reasonably related to the Defendants' offenses.

We begin by noting the trial court has the discretion to impose either consecutive or concurrent sentences. See State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). A trial court may order consecutive sentences in cases where it finds applicable, by a preponderance of the evidence, any of seven statutorily enumerated criteria. See Tenn. Code Ann. § 40-35-115(b).

In addition to these criteria, consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed," and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) and (4). The Defendants' potential for rehabilitation should also be considered. § 40-35-103(5). Additionally, we are advised that "the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Tenn. Code Ann. § 40-35-115 Sentencing Commission Comments.

The trial court found two of the sentencing criteria applicable in this case: (4) the Defendants are dangerous offenders whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and (6) the Defendants committed the offenses while both were on probation. § 40-35-115(a)(4) and (6). As to the first criterion, number (4), our supreme court has mandated that

> the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In the case at hand, the trial court made adequate findings that the Defendants were dangerous offenders and that extended sentences were necessary to protect the public. The trial court stated for the record:

> I do think 4 is applicable, that he is dangerous offender whose behavior indicates little or no regard for human life. The circumstances of this were, I thought, pretty extreme, to go armed into a home with these type weapons. . . .
>
> . . . I find that Mr. Rutherford is a dangerous offender. I think that society needs protection from him, and I think that the aggregate sentence is reasonably related to the severity of the present offenses. . . .
>
> . . . .
>
> Now, I will say this, as to Mr. Whited, I have to determine whether or not I'm going to run these all consecutively. Mr. Whited, in my opinion, is a dangerous offender[.] . . .
>
> . . . The fact is, I have been on this bench a long time and I've seen a lot of defendants come through here, and I think Mr. Whited represents one of the most dangerous I've ever seen. I think society needs protection from him. I think he is

dangerous, and I am going to have all these sentences run consecutively; and I think that the aggregate length of the sentence I'm imposing today is reasonably related to the severity of the [Defendant's] present offense.

We conclude that the trial court's findings are supported by the record. Whited contends there is no factual basis to support the trial court's "subjective opinion." We disagree. Whited was convicted of five separate criminal offenses, each involving violence toward different individuals. Whited also has a history of criminal activity. Furthermore, we find Rutherford's argument equally unpersuasive. Rutherford suggests that his sentences should have been ordered to run concurrently because he acted in self-defense. The jury obviously found otherwise when rendering its verdicts in this case; Rutherford's suggestion is not supported by the facts. Accordingly, the trial court properly applied factor (4).

Nevertheless, the trial court also ordered consecutive sentences based upon the fact that both Defendants were on probation when they committed the crimes in this case. As the State notes on appeal, neither Defendant challenges the trial court's finding in this respect. This Court has previously recognized that only one factor need be proven to support a consecutive sentence. State v. Ernest Leon Powers, Jr., No. 03C01-9606-CC-00222, 1997 WL 665986, at *9 (Tenn. Crim. App., Knoxville, Oct. 28, 1997). "Because only one ground is required to justify consecutive sentencing, as long as that ground is proven by a preponderance of the evidence, we are able to affirm the trial court's order of consecutive sentencing." Id. (citing Tenn. Code Ann. § 40-35-115). Accordingly, the trial court's finding that both Defendants were on probation at the time of the crimes in this case is sufficient to support its order of consecutive sentencing. When a trial court imposes consecutive sentences based upon this factor, it is not required to make the additional finding, mandated by Wilkerson, that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed. See State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999). Having reviewed the record, we conclude that the length of the Defendants' sentences are "justly deserved in relation to the seriousness of the offense[s]" and are "no greater than that deserved for the offense[s] committed." Tenn. Code Ann. §§ 40-35-102(1) and 40-35-103(2).

### C.    Blakely v. Washington

The Defendants also argue, relying upon the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), that their sentences were imposed in violation of their Sixth Amendment right to a trial by jury. The Blakely decision holds that the Sixth Amendment to the federal Constitution permits a defendant's sentence to be increased only if the enhancement factors relied upon by the trial judge are based upon facts reflected in the jury verdict or admitted by the defendant. The only basis upon which enhancement would otherwise be permitted is the defendant's previous criminal history. The Tennessee Supreme Court has considered the impact of the Blakely ruling on Tennessee's sentencing scheme and has concluded that the Criminal Sentencing Reform Act of 1989, under which the Defendants in this case were sentenced, does not violate a defendant's Sixth Amendment rights. See State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005). The Defendants acknowledge our supreme court's ruling in Gomez, however, they state in

their appellate briefs that they raise this issue in order to preserve it should <u>Gomez</u> be overturned. Accordingly, given the current state of the law, the Defendants' argument on this basis has no merit.

## CONCLUSION

Based upon the foregoing analysis and discussion, we hereby affirm the Defendants' convictions and sentences.

_____
DAVID H. WELLES, JUDGE